**In re Joseph T. KOLINSKY, Debtor.**

**G.B.G., INC., and Jay E. Russ, Plaintiffs,**

**v.**

**Joseph T. KOLINSKY and Conjo Realty Corp., Defendants.**

**Bankruptcy No. 86 B 20217. No. 92–5020A.**

United States Bankruptcy Court, S.D. New York.

Sept. 18, 1992.

---

Stroock & Stroock & Lavan, New York City, for plaintiffs.

Rosen, Einbinder & Dunn, P.C., New York City, for defendants.

## DECISION ON MOTION FOR SPECIFIC PERFORMANCE OF CONJO CONTRACT

HOWARD SCHWARTZBERG, Bankruptcy Judge.

G.B.G., Inc. ("G.B.G.") and Jay Russ ("Russ"), the plaintiffs in this adversary proceeding, are suing the debtor, Joseph Kolinsky ("Kolinsky"), and his wholly-owned, nondebtor corporation, Conjo Realty Corp. ("Conjo"), for specific performance of a contract for the sale and purchase of real property. G.B.G. is the prospective purchaser and Russ is the broker that arranged the transaction. G.B.G. and Russ argue that they are entitled to specific performance because they have made a valid demand for a closing and have indicated that they are ready, willing, and able to fully comply with their obligations under the contract. G.B.G. asserts that the demand is consistent with the terms of the contract which gives them the absolute right to demand a closing upon thirty days notice.

Conjo and Kolinsky argue that specific performance is not warranted in this case for several reasons. Initially, they assert that G.B.G. did not tender performance because it substantially reduced the amount due and owing under the contract. They contend that G.B.G. improperly reduced the contract price by amounts that G.B.G. alleges were paid as advances and by the interest accruing on development expenses that G.B.G. claims to have incurred. Conjo and Kolinsky further argue that G.B.G.'s attempt to reduce the purchase price was fraudulent and that this fraud constitutes unclean hands, a defense to specific performance. In addition, the defendants allege that the contract is voidable because Russ engaged in self-dealing and professional misconduct in connection with the transaction. Finally, Conjo and Kolinsky argue that G.B.G. materially breached a joint venture agreement which they entered into with Kolinsky. The breach of this related agreement constitutes a breach of the real property contract.

Kolinsky has filed a counterclaim in which he demands that the defendants turnover to him a 30% interest in G.B.G. which he alleges that he is entitled to pursuant to a joint venture agreement that he entered into with the principals of G.B.G. G.B.G. resists Kolinsky's claim and explains that under the agreement Kolinsky is only entitled to a portion of the profits of the joint venture and not an ownership interest.

## FINDINGS OF FACT

1. On May 8, 1986, the defendant, Kolinsky, filed with this court a petition for relief under Chapter 11 of the United States Bankruptcy Code and continued to operate his business as a debtor in possession in accordance with 11 U.S.C. §§ 1107 and 1108.

2. Defendant, Conjo, is a New York corporation. The debtor, Kolinsky, is its sole shareholder. Conjo's primary asset is a parcel of approximately three and a half acres of real estate with buildings and improvements located on waterfront property on City Island, New York.

3. The plaintiff G.B.G. is a New York corporation whose sole shareholders are Joseph P. Gagliano ("Gagliano"), Alexander M. Goren, and James Goren (collectively, the "Gorens"). The plaintiff Russ has played several roles with respect to this adversary proceeding. He served at various times as attorney for Conjo, as attorney for G.B.G., and as the real estate broker who arranged the transaction which is the subject of the adversary proceeding.

4. Transportation Services, Inc. ("TSI") is a New York corporation which is in the business of repairing and rebuilding gasoline and diesel engines. TSI was a tenant on the Conjo property. Kolinsky is the sole shareholder of TSI. TSI filed with this

court a petition for reorganizational relief under Chapter 11 of the United States Bankruptcy Code on April 30, 1986. This court confirmed TSI's plan of reorganization on April 18, 1988. The plaintiff in this case, G.B.G., funded TSI's plan with $500,000.00. G.B.G. furnished the money to TSI as part of the down payment required under the contract in question.

5. On April 7, 1987, Kolinsky, on behalf of Conjo, entered into a contract with Gagliano and the Gorens (collectively, "Purchasers"), for the sale and purchase of Conjo's real property. The Purchasers thereafter assigned their rights in the contract to G.B.G. The contract contains the following provisions relevant to this proceeding:

A. The purchase price was $1.7 million. Upon the signing of the contract, the Purchasers were required to deposit $200,000.00 and $100,000.00 in two escrow accounts held by Conjo's attorney, Russ & Weyl, P.C. The contract provided that the sale would be consummated at two closings, an initial closing to occur within 14 days after Conjo sends to the Purchasers an order from this court approving the sale ("First Closing") and a final closing ("Second Closing"). At the Second Closing, the Purchasers were required to execute a purchase money mortgage ("Purchase Money Mortgage") in favor of the seller in the amount of $1,400,000.00. However, the amount of the Purchase Money Mortgage could be reduced by certain payments made by the Purchasers in connection with the property. The Purchasers have the absolute right to close title at any time upon giving 30 days notice to the Seller.

B. Purchasers would pay $500,000.00 to fund a plan to pay the creditors in the TSI bankruptcy case in full. The interest accruing on this advance would be credited to the Purchase Money Mortgages at the Second Closing.

C. The sale was subject to the rezoning of the property to allow for condominium and waterfront development. Purchasers would have the responsibility for obtaining a rezoning to allow for the erection of 72 condominium units and 72 boat slips.

D. Purchasers would have five years from the contract date to exert their best efforts to obtain the necessary rezoning. If the rezoning was not obtained, either party could cancel the contract.

E. In the event that the rezoning application was denied, or approved for fewer than 72 units and slips, or not acted upon by the expiration of the five-year period, purchasers at their sole option could elect to close title for the full contract price or cancel the contract.

F. The Purchasers agreed to pay all real estate taxes due and accruing on the Conjo property for the period from July 1, 1987 to the Second Closing. The amount paid by the Purchasers and the interest thereon would be treated as an advance of the Purchase Money Mortgage which was to be executed at the Second Closing.

G. At the First Closing, Conjo was required to execute a mortgage and note in favor of the Purchasers for $750,000.00. This mortgage was in consideration for the Purchasers' advances to Kolinsky and TSI is a first lien on the Conjo property. Interest on this mortgage was set at a rate of 2% above the interest rate announced by Manufacturers Hanover Trust Company (MHT) as its reference rate. Conjo was required to pay mortgage taxes, recording fees and insurance fees relating to this mortgage at the First Closing. The mortgage provided that it would be satisfied at the Second Closing.

H. At the Second Closing, the money the Purchasers had advanced for taxes and the $100,000.00 down payment together with interest on both would be credited towards the Purchase Money Mortgage. Should the contract be cancelled, these amounts must be paid by Conjo to the Purchasers within one year from the cancellation date.

I. Conjo, at its option, may credit any of its unpaid debts relating to the Conjo property, such as tax obligations, to the purchase price. However, the Seller

shall not receive less than $200,000.00 in cash at the Second Closing.

J. In the event of cancellation, Conjo is liable to the Purchasers for all costs in connection with a title search.

K. At the Second Closing, the Purchaser is required to pay all of the Seller's closing expenses including New York State Capital Gains Tax and Transfer Tax. However, such payments will reduce the principal of the Purchase Money Mortgage.

L. Money advanced for the purchase and development of the property was to bear interest. Like the interest on Conjo's mortgage, interest on these expenditures would be calculated at a rate 2% higher than the MHT reference rate.

6. The contract also stated that Russ, Conjo's attorney, was the broker who brought about the transaction and that there was a separate agreement which required Conjo to pay him a brokerage commission ("Broker Agreement"). The Broker Agreement which was also executed on April 7, 1987 set Russ's commission at $200,000.00 and it provided that the commission was payable to Russ only if title closed and Conjo received the consideration due under the contract. Russ is suing Conjo, in this proceeding, for his brokerage commission. Conjo argues that, under the plain language of the Broker Agreement, Russ is not entitled to a commission until title passes and it receives the contract price. Because title has not yet passed and Conjo has not obtained the agreed upon consideration, Conjo argues that Russ's claim for a commission is premature.

7. Kolinsky, on behalf of Conjo, signed a document ("Waiver") which permitted Russ to act as attorney for the Purchasers in a limited capacity. The Waiver provides as follows:

> CONJO REALTY CORPORATION hereby consents that JAY EDMOND RUSS, ESQ., acting as attorney for the Purchasers and the entity submit for re-zoning, the various permits necessary under the terms of the contract between CONJO REALTY CORPORATION and JOSEPH P. GAGLIANO, ALEXANDER G. GOR-EN and JAMES G. GOREN, doing business as GOREN BROTHERS.

Plaintiff's Exhibit 4 in Evidence.

8. The Waiver enabled Russ to assist G.B.G. in its efforts to develop the Conjo property. Conjo and Kolinsky argue that Russ had been acting as attorney for the G.B.G. and the Purchasers before the Waiver was executed. Indeed, a member of Russ & Weyl, Esq., Russ's law firm, had already filed a certificate of incorporation with the State of New York on behalf of G.B.G. The certificate was received by the Department of State of the State of New York on March 31, 1987 and was filed shortly thereafter. The defendants assert that a conflict of interest was created when Russ represented the Purchasers and G.B.G. while he was acting as Conjo's attorney and broker in connection with the Conjo contract. Conjo alleges that this conflict of interest renders the Conjo contract voidable. G.B.G. asserts that Russ did not act as attorney for the Purchasers when a member of his firm filed the certificate of incorporation. Russ testified at the trial that he never saw the certificate of incorporation. He surmised that a paralegal from his firm probably filed the form.

9. On April 7, 1987, Kolinsky and the Purchasers also entered into a joint venture agreement ("Joint Venture Agreement"). The Joint Venture Agreement provided that the corporation formed by the Purchasers to act as the assignee of the contract, namely G.B.G., would have full charge of the development, construction, and sale of the condominium and marina project. The net profits from this development project would be distributed 70% to G.B.G. and/or its designees and 30% to Kolinsky. Kolinsky has asserted a counterclaim in this proceeding in which he seeks a declaration that he has a 30% ownership interest in G.B.G. G.B.G. opposes the counterclaim on the ground that the agreement clearly specifies that Kolinsky only has an interest in the profits of the joint venture.

10. Pursuant to the Joint Venture Agreement, books and records reflecting the financial condition of the Joint Venture

were to be kept and made available to the parties to the agreement. In addition, an annual accounting was to be prepared and rendered to each party to the agreement. Kolinsky demanded an accounting on July 25, 1991 through his attorney William E. Dumke, Esq. ("Dumke"), a member of the law firm David Worby, P.C. Despite this request, he was never furnished with an accounting.

11. The Joint Venture Agreement provided that all proceeds received by the Joint Venture would be first paid out to satisfy the "costs, expenses, taxes, and debts of the entity for the development and sale of the project, together with appropriate interest thereon, including interest on mortgage as it becomes due and payable, excluding monies advanced for the purchase of the property." Plaintiff's Exhibit 2 in Evidence, at ¶ 10(a).

12. Shortly after the execution of the Conjo contract and Joint Venture Agreement, the Purchasers assigned the Conjo contract and Joint Venture Agreement to G.B.G.

13. Russ served as a director and officer of G.B.G. for a period of time during 1987 and 1988. He also acted as general counsel to G.B.G. to coordinate the rezoning efforts.

14. During the past three years, the Conjo contract has been the subject of numerous proceedings before this court. In an action which the debtor commenced against its former attorneys, Russ & Weyl, and the purchaser under the Conjo real estate contract, G.B.G., this court ruled, among other things, that the defendants' motion for abstention should be denied. *In re Kolinsky,* 100 B.R. 695 (Bankr.S.D.N.Y. 1989). Thereafter, the court addressed the debtor's action to rescind the Conjo contract for the sale of the City Island real estate to G.B.G. and held that the debtor was not entitled to rescission because there was no proof that the defendants did not intend to use their best efforts to obtain a rezoning of the property pursuant to the terms of the contract. *In re Kolinsky,* 110 B.R. 128 (Bankr.S.D.N.Y.1990). This court concluded that the debtor had failed to prove that he was fraudulently induced into entering the Conjo contract with the defendants. Subsequently, G.B.G. filed a complaint in the adversary proceeding now before the court in which it seeks specific performance of the Conjo contract. Thereafter, G.B.G. moved to have Conjo's counsel, the law firm Rosen, Einbinder & Dunn, P.C., disqualified on the ground that a partner in the firm, Richard Rosen, had a stake in the outcome of the litigation because a corporation in which he was shareholder, had agreed to purchase G.B.G.'s rights to the Conjo property. The court denied the motion in an opinion dated April 7, 1992. *See In re Kolinsky,* 138 B.R. 773 (Bankr. S.D.N.Y.1992). Shortly thereafter, this court denied a motion for summary judgment made by G.B.G. to dismiss the debtor's affirmative defenses and counterclaim. *See In re Kolinsky,* 140 B.R. 79 (Bankr. S.D.N.Y.1992).

15. G.B.G. now seeks specific performance of the Conjo contract. G.B.G. argues that it is entitled to specific performance because it validly demanded a closing by a letter dated November 11, 1991 written by Russ to Dumke, Conjo's attorney. Russ had previously sent two letters to Dumke dated September 24, 1991 and October 1, 1991, respectively. These letters essentially advised Dumke that the Conjo property had been rezoned to allow for the construction of 51 residential units. The letters further indicated that G.B.G. was prepared to exercise its right to close, even though the Conjo contract was expressly conditioned upon the approval of 72 residential units.

16. The November 11, 1991 letter stated that G.B.G. was ready, willing and able to close title and to comply with all of the terms and conditions of the Conjo contract. It also indicated that the final closing was scheduled for December 19, 1991 and it declared that time was of the essence.

17. In the letter, Russ stated that the balance of the purchase price due to Conjo under the Conjo contract was $628,516.97 as of November 4, 1991. Russ computed this figure by subtracting the down payments and advances made by the Purchas-

ers pursuant to the contract from the $1,700,000.00 purchase price. Russ further deducted the accrued interest on expenses incurred in connection with the develop-ment of the Conjo property. The total credit of $1,071,483.03 was apportioned as follows:

| | |
|---|---|
| Down payment | $100,000.00 |
| Cash portion of the purchase price to be paid to broker $200,000.00 | |
| Real estate taxes advanced as of Nov. 4, 1991 | $180,324.26 |
| Interest on the six hundred thousand ($600,000.00) dollars of payments pursuant to the contract, real estate taxes and monies advanced for purchasing and further developing the property up to Nov. 4, 1991 | $591,158.77 |

*Plaintiff's Exhibit 8 in Evidence.* A computer generated schedule of payments ("Schedule") made by G.B.G. in connection with the development of the Conjo property ("Schedule") was annexed to the November 11, 1991 letter. The Schedule identifies the payee as well as the payment date. It also sets forth the interest due on advances made and on developmental expenses. The Schedule is arranged chronologically according to the payment date.

18. G.B.G.'s Schedule lists the individuals and entities that G.B.G. alleges were paid in connection with the development of the Conjo property. Among the payees[1] listed are David Lewis ("Lewis"), an architect and the brother-in-law of Gagliano; Jay Russ, acting as attorney for G.B.G.; Trans–America Abstract Service Inc. (Transam), a title search company; Robert Kandel ("Kandel"), a land use lawyer who was instrumental in rezoning the Conjo property; Stroock & Stroock & Lavan, ("Stroock") counsel to G.B.G. in connection with the litigation before this court; Levy & Tolman, counsel to G.B.G. in connection with G.B.G.'s attempt to sell its rights in the Conjo contract; Konheim & Ketcham, special counsel for environmental matters; the New York City Planning Department; and, the New York City Tax Collector.

19. Most of the payments were made by Russ's law firm, Russ & Russ, Esq., from and escrow account and by Here Comes the Sun ("HCTS"), a real estate development and management company controlled by Gagliano. HCTS received a 10% commission of practically all of the payments it made as a management fee. A series of invoices from HCTS to G.B.G. which itemize the payments made and HCTS's commission was presented at the trial (Defendant's Exhibit E in Evidence). Annexed to each invoice is a copy of a cancelled check payable to HCTS from G.B.G. in the amount of the invoice.

20. Kolinsky argues that HCTS is not entitled to a management fee from G.B.G. for paying some of the developmental expenses relating to the Conjo property. The management fee, which was charged to the Joint Venture, was never agreed upon by Kolinsky as a legitimate development expense. At the trial, Kolinsky testified that he had discussions with Gagliano and others regarding the development expenses. Kolinsky stated that he understood from those conversations that all parties employed in connection with the development would be "outside concerns" rather than entities related to the principals of G.B.G.

21. Daniel Tartaglia, Esq. ("Tartaglia"), an associate at David Worby, P.C., responded to Russ's November 11, 1991 letter by a letter dated November 26, 1991. Tartaglia disputed the amount that G.B.G. had calculated as an offset on the purchase price.

22. Conjo then retained the law firm of Rosen, Eisenbinder & Dunn, P.C. Terrence

---

**1.** The schedule lists the individuals and entities that were paid by G.B.G. in a category labeled "PAYOR." However, they are more appropriately referred to herein as payees.

Dunne, Esq., ("Dunn") a member of the firm, responded to Russ's demand for a closing in a letter dated December 13, 1992. Dunn's letter stated that Conjo rejects G.B.G.'s demand for a closing. Dunn alleged that G.B.G. had failed to carry out its obligations under the Conjo contract and questioned the validity and the accuracy of the advances that G.B.G. claimed to have made in connection with the development of the Conjo property. Dunn further asserted that G.B.G.'s unilateral attempt to declare that time was of the essence with regard to the closing date was improper.

23. Conjo argues that many of the expenditures listed by G.B.G. on its Schedule are improper. Therefore, Conjo asserts that it is not liable for the accrued interest on these expenses. Conjo questions the legitimacy of payments allegedly made to HCTS as a management fee and to Lewis. Some of the payments claimed to have been made to Lewis are not substantiated with an invoice or cancelled check. Conjo also contends that the legal fees paid by G.B.G. to Russ, Levy & Tolman, and Stroock are not in the nature of development expenses but, rather, were made in connection with legal proceedings that are unrelated to the development of the Conjo property.

24. Kolinsky testified that he never had any discussions with the principals of G.B.G. concerning attorneys fees. He stated that he did not think that counsel fees were valid development expenses. G.B.G. denies this allegation and maintains that all expenditures relate to the development of the Conjo property.

25. Conjo argues that G.B.G.'s claim for specific performance of the Conjo contract must be denied because G.B.G. failed to tender performance in accordance with the terms of the contract. Conjo asserts that under prevailing case law, the tender of payment in an incorrect amount or in a method other than called for in the contract, is invalid. Accordingly, Conjo contends that because G.B.G. improperly reduced the contract price in its letter of November 11, 1991, it is not entitled to specific performance.

26. Michael Drogin ("Drogin"), a certified public accountant, prepared the Schedule with information provided to him by the Purchasers. However, he testified that he did not substantiate the figures with invoices or checks. He also stated that he did not make any inquiry as to the propriety of the expenses claimed by the Purchasers.

27. At the trial, G.B.G. presented a series of cancelled checks that were made payable to the individuals and entities listed on its Schedule. There are discrepancies between the cancelled checks and the amount claimed to have been paid on the Schedule. Various items listed on G.B.G.'s Schedule are undocumented. In addition, the dates on many of the checks do not correspond to the payment date listed on the Schedule. Conjo asserts that the expenses are not substantiated because they do not exist. It claims that G.B.G. has fraudulently added certain items to the Schedule. G.B.G. argues that the relevant documents either have been misplaced over the course of this litigation or are unavailable because they are in the possession of Herrick, Feinstein, Kolinsky's former attorney.

28. G.B.G.'s Schedule indicates that Lewis was paid $155,330.54. However, the cancelled checks payable to Lewis total approximately $95,000.00. G.B.G. has accordingly reduced its claim.

29. The reduced claim appears on a revised schedule ("Revised Computation Summary") prepared by Drogin. The Revised Computation Summary sets forth the expenses allegedly incurred in the development of the Conjo property from April 7, 1987, the date that the Conjo contract was executed, through August 4, 1992. The Revised Computation Summary is categorized according to payee. The amount of each payment and payment date is indicated. The number of the check used to make the payment and the name of the payee appears next to the payment amount. Virtually every payment is supported by a check number. Interest on each payment is appropriately calculated according to the terms of the Conjo contract.

178

■ 30. Based on all the evidence in the case, this court finds that the plaintiff purchasers were ready, willing and able to close title in accordance with their written demand for closing, dated November 11, 1991. However, the debtor's refusal to proceed with the closing was based on a legitimate dispute as to the precise calculation of the required tender of payment. The debtor was entitled to an accounting from the plaintiffs as to the amounts to be credited to the plaintiffs as deductions from the purchase price. Absent such accounting and in light of the disputed credits the debtor cannot be faulted for refusing to proceed with the closing.

31. In this action for specific performance, the court is in a position to determine the amounts to be credited against the purchase price based upon the evidence, so that no further tender is required.

32. In determining the credits against the purchase price it is clear that pursuant to paragraph 2(b) of the Conjo contract "the total monies advanced for taxes ... shall be credited to Purchaser on account of the purchase price...." The purchaser paid $221,523.80 for real estate taxes, inclusive of $11,643.02, for interest and late charges. This court previously found that the purchasers delayed the payment of the seller's delinquent tax bills until after the commencement of this adversary proceeding. *In re Kolinsky*, 110 B.R. at 134. The purchasers contend that the delay was due to the debtor's failure to forward the tax bills to them. There was no credible evidence presented to sustain this point. Accordingly, the $11,643.02 sum for interest and late charges will be deducted, with the result that the purchasers are entitled to a credit for real estate taxes against the purchase price in the sum of $209,880.78.

33. The plaintiffs claim credit for $56,156.63 as interest accrued on the real estate taxes which they paid. This interest must be recalculated based on the reduced sum of $209,880.78, rather then the total tax figure of $221,523.00, which the plaintiffs claimed as a credit.

■ 34. The sum of $348,502.85 is claimed as a credit for interest paid on the two advances of $100,000.00 and $500,000.00. The rate of interest is specified in paragraph 12(b) of the Conjo contract as "2% or a rate of interest equal to the rate publicly announced by Manufacturers Hanover Trust Company (MHT) as its reference rate ('the Reference Rate')." The sellers gave the purchasers a $750,000.00 purchase money note and mortgage to secure the advances. Paragraph 2(b) of the Conjo contract provides that "the total of the monies advanced for taxes and the $100,000.00 down payment with accrued interest on both, plus accrued interest only on the $500,000.00 paid to the tenant, Transportation Services, Inc., shall be credited to Purchaser on account of the purchase price and to the extent applicable in reduction of the Purchase Money Note and Mortgage...." The sum of $348,502.25 represents properly computed interest on the total $600,000.00 advances and shall be credited against the purchase price.

■ 35. The major contested credit is the sum of $268,541.58, which the plaintiffs claim as interest charges on the development expenses which they paid. Paragraph 2(b) of the Conjo contract is specific that interest will be changed to the sellers for monies advanced by the purchasers and for real estate taxes paid by the purchasers. This paragraph does not say that the sellers will also be charged with development expenses incurred by the purchasers. There is no question that the parties contemplated that expenses for developing the property would also bear interest. This point is expressed in paragraph 12(a) of the Conjo contract as follows: "All mortgages, and all monies advanced for purchasing and developing the property shall bear interest." However, the subject of developing the property was simultaneously addressed in a separate Joint Venture Agreement between the parties. This fact is noted in paragraph 13 of the Conjo contract which states that the simultaneously executed Joint Venture Agreement is incorporated in the Conjo contract by reference. Paragraph 10(A) of the Joint Venture Agreement provides that the proceeds re-

ceived by the development, construction and sale of the project shall be subject to

> FIRST: Payment of all costs, expenses, taxes and debts of the entity for development and sale of the project, together with *appropriate interest* thereon, including interest on mortgage as it becomes due and payable, excluding monies advanced for the purchase of the property....

Joint Venture Agreement, at ¶ 10(A) (emphasis added).

It is clear from the integration and incorporation of the Joint Venture Agreement in the Conjo contract that the parties intended that the development expenses, which were separately addressed in the Joint Venture Agreement, would bear interest, as calculated under the Conjo Contract. However, interest on development expenses should be deducted from the proceeds received by the parties under the Joint Venture Agreement and not as a credit against the purchase price under the Conjo contract. Manifestly, it was contemplated that development activities and expenses would arise after the closing of title and would be governed by the terms of the Joint Venture Agreement rather than pursuant to the contract of purchase. Hence, this court finds that the parties intended that the interest on the development expenses would not be deducted as a credit against the purchase price, but would be applied against the proceeds to be distributed to the parties under the Joint Venture Agreement. Therefore, the plaintiff purchasers are not entitled to a credit of $268,541.58 against the purchase price for interest on development expenses.

■ 36. The defendants' affirmative defense that Jay Russ breached his fiduciary duty by acting as both broker in the Conjo transaction and attorney for the purchasers was not sustained by a preponderance of the evidence. When the Conjo contract and the Joint Venture Agreement were executed on April 7, 1987, Jay Russ's father, Abraham Russ, was asked by the parties to act as attorney for the G.B.G. purchasers to proceed with the rezoning and development activities required in order for the purchasers to close title pursuant to the contract of sale. Abraham Russ declined to act. The parties present requested that his son and partner, Jay Russ, assume this responsibility instead. Therefore, the debtor, Kolinsky, on behalf of Conjo, consented in writing that Jay Russ should act as attorney for the purchasers and submit for rezoning and the various permits necessary under the terms of the Conjo contract.

■ 37. The fact that Jay Russ's office may have submitted a certificate of incorporation to the office of the New York Secretary of State for the formation of G.B.G. on March 31, 1987, one week before the debtor and Conjo consented to his acting as attorney for the purchasers, does not taint the transaction or bar specific performance. The technical conflict which existed before the debtor and Conjo consented to Russ acting as attorney for the purchasers as well as broker with respect to the sale does not constitute an actionable fraud, in light of the written consent. Additionally, the fact that Russ became an officer of G.B.G. after the consent waiver was signed by the debtor is consistent with his interest as attorney for the purchasers to take all steps and execute all documents necessary to proceed with the closing of title. Moreover, there was no proof that the debtor sustained any damage as a result of Russ acting as both broker and attorney for the purchases. Presumably, it was in the debtor's best interest for the purchasers to take whatever steps were required to enable them to close title.

■ 38. The defendants have not sustained their affirmative defense that there was a breach of the Joint Venture Agreement with Gagliano and the Gorens which, in turn, constituted a material breach of the Conjo contract. Paragraph 4 of the joint venture agreement provides that the *net profits* from the Joint Venture shall be distributed 70% to Gagliano and the Gorens and 30% to the debtor, Kolinsky. Paragraph 4 provides that the Conjo contract of purchase which Gagliano and the Gorens executed "may be transferred to a corporation to be formed." There is nothing in the Joint Venture Agreement to the effect that

the debtor would be entitled to a 30% equity share in any corporation which Gagliano and the Gorens might thereafter form and to which the Conjo purchase contract would be assigned. Accordingly, the plaintiffs' refusal to convey a 30% share interest in G.B.G. does not constitute either a breach of the Joint Venture Agreement or a material breach of the Conjo contract.

■ 39. The defendants argue that the Joint Venture Corporation, G.B.G., failed to provide accounting information to them. This claim does not constitute a breach of the Conjo contract so as to bar specific performance. The purchase rights under the Conjo contract are not conditioned on the performance of any of the terms and duties delineated under the separate Joint Venture Agreement, which dealt with the development, construction and sale of the proposed project, as distinguished from the conditions for closing title expressed in the Conjo contract. On the other hand, the terms and conditions of the Conjo contract were incorporated in the Joint Venture Agreement.

■ 40. Plaintiff Russ's claim for brokerage commissions is premature. The Broker Agreement, dated April 7, 1987, with Russ provides that he is entitled to a brokerage commission of $200,000.00 "only if, as and when title closes ... and the Seller receives the consideration set forth in the contract of sale...." Therefore, Russ may claim his brokerage commission only after Conjo is paid at the closing of title.

## DISCUSSION

There are several issues now before the court. This court must first decide whether or not specific performance of the Conjo contract should be ordered. If it is, the court must determine the contract price. This court must also consider whether Russ's questionable conduct renders the contract voidable and whether Russ is entitled to a broker commission. Finally, the court must ascertain Kolinsky's interest in the Joint Venture.

■ For the plaintiffs to obtain an order for specific performance under the Conjo contract, they must have substantially performed their contractual obligations or timely rendered performance under the contract, and must be ready, willing and able to perform their contractual obligations. *Hadcock Motors, Inc. v. Metzger,* 92 A.D.2d 1, 459 N.Y.S.2d 634 (4th Dept. 1983); 96 N.Y.Jur.2d, *Specific Performance,* § 23 (1992). The plaintiffs in this case were ready, willing and able to perform their contractual obligations. However, the defendants contend that the tender was insufficient and amounted to an attempt to defraud them. The problem stems from a legitimate dispute as to the calculation of credits against the purchase price to which the purchasers are entitled. Therefore, the court has determined the adjustment so that the parties may conclude their agreed transaction. It would be inequitable to say that the Purchasers are not entitled to acquire the real estate they contracted to purchase after having advanced over $2.1 million in anticipation of consummating the transaction.

> In determining the right to relief, it is the province of the court to do equity and compel fair dealings; it is not to aid in clever attempts to escape just obligations.

96 N.Y.Jur.2d, *Specific Performance,* § 23 (1992).

The defendants' affirmative defenses relating to propriety of the tender and the allegation that the Purchasers intended to defraud the sellers by claiming improper credits simply illustrate the fact that a dispute exists as to the precise credits which are allowable against the purchase price. This dispute has been resolved by the court based upon the objective intent of the parties, as expressed in the Conjo contract and in the Joint Venture Agreement. Thus, the affirmative defenses of fraud and unclean hands were not sustained.

The affirmative defense that the Conjo contract is void because Jay Russ's position as attorney for the Purchasers was not disclosed to the defendants at the time of the execution of the Conjo contract and

Joint Venture Agreement was not sustained. The defendants consented in writing at that time that Jay Russ would act as attorney for the Purchasers. Jay Russ's dual role as broker and attorney for the Purchasers was consistent with the defendants' objective of selling the real estate in question to the Purchasers. Such conduct in no way impairs or voids the Conjo contract.

The affirmative defense that there was no meeting of the minds because the Conjo contract and the Joint Venture Agreement are ambiguous has not been sustained. The intent of the parties can be ascertained from the plain meaning of the language in both agreements.

The counterclaim asserted by defendant, Kolinsky, that he is entitled to a thirty percent share interest in the corporation which the joint venturers, Gagliano and the Gorens, formed, was not sustained. There was no evidence that the parties ever agreed that defendant, Kolinsky, was to have any equity share of a corporation which the Gagliano and the Gorens might later form. His interest was strictly limited to the net profits from the joint venture.

In the second claim for relief, Plaintiff Jay Russ alleges that because Conjo failed to perform under the real estate contract, he is now entitled to a $200,000.00 brokerage commission. However, this court did not find that Conjo breached the real estate contract. Performance was not consummated because of the legitimate dispute as to the precise credits to be allowed against the purchase price. Russ is not entitled to recover under this claim because his $200,000.00 brokerage commission is payable only if title closes. Therefore, the claim for brokerage commissions should be asserted by Russ only after the sellers receive the purchase price. The second claim for relief has not been sustained.

Because the instant proceeding involves issues under contracts under state law which were entered into in the post-petition period, it follows that applicable law in the Second Circuit renders this post-petition dispute uniquely a 28 U.S.C. § 157(b)(2)(A) core proceeding in the administration of this case. *In re Ben Cooper, Inc.,* 896 F.2d 1394, 1400 (2d Cir.1990), *vacated and remanded,* —— U.S. ——, 111 S.Ct. 425, 112 L.Ed.2d 408 (1990), *superseded,* 924 F.2d 36 (2d Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 2041, 114 L.Ed.2d 126 (1991).

## CONCLUSIONS OF LAW

1. This court has jurisdiction of the subject matter and the parties pursuant to 28 U.S.C. §§ 1334 and 157(a). The plaintiffs' suit against the defendants is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A).

2. Plaintiff G.B.G. is entitled to specific performance of the Conjo contract.

3. Plaintiff G.B.G. is entitled to a credit against the purchase price for real estate taxes paid in the sum of $209,880.79, together with interest thereon in accordance with the contract interest rate.

4. Plaintiff G.B.G. is also entitled to a credit against the purchase price for $348,502.85 as interest paid on the two advances of $100,000.00 and $500,000.00.

5. Plaintiff G.B.G. is not entitled to a credit against the Conjo contract purchase price for interest on development expenses paid by it. Appropriate interest on properly incurred development expenses should be subtracted from the net proceeds under the Joint Venture Agreement.

6. The defendants have not sustained their affirmative defenses and counterclaim for a thirty percent share in G.B.G.

7. Plaintiff Russ has not sustained his claim for an immediate payment of a $200,000.00 brokerage commissions. This commission should be paid only after the sellers receive the balance of the purchase price due under the Conjo contract. Therefore, the Russ claim should be dismissed.

8. The affirmative defenses and the counterclaim should be dismissed.

SETTLE ORDER on notice.